## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROYAL DISPOSABLE MEDICAL & SAFETY SUPPLIES, INC. d/b/a ROYAL DENTAL SUPPLY on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>        Defendants. | Case No.<br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, on behalf of itself and all others similarly situated, bring this consolidated class action complaint for equitable relief and treble damages under the Sherman Act, 15 U.S.C. § 2.

## I.    SUMMARY OF THE ACTION

1.      The United States Department of Justice and eleven state attorneys general recently filed a civil antitrust action against Google for unlawfully maintaining monopolies in the markets for online search and search advertising.  Case No. 1:20-cv-03010 (D.D.C. filed Oct. 20, 2020).  The present action stems from Google's monopoly conduct in the separate markets for online display advertising.

2.      Over the past several years, Google leveraged its stranglehold on online search and search advertising to gain an illegal monopoly in brokering display advertising, *i.e.*, the placement of advertisements on other companies' websites.  Google achieved this market dominance in part by acquiring rivals in the online advertising space, conditioning access to its

search-results data and YouTube video advertising platform upon the purchase of its separate display advertising services, and ensuring those systems were not compatible with those of its competitors in online advertising. Forty-nine state attorneys general are currently conducting antitrust investigations of Google's conduct in digital advertising markets.

3.      Because of its pervasive monopoly conduct, Google now controls the "ad tech stack" comprising the intermediary services between advertisers, who pay to place digital advertisements, and publishers who are paid to publish those ads on their websites. Companies that wish to place or publish online advertisements have little choice but to pay Google for its advertising services, including its instantaneous auction platforms, and Google's monopolization of this intermediation market has enabled it to favor its own advertising platforms and products. Google's extraction of monopoly rents through fees charged to both advertisers and publishers has resulted in higher prices paid by advertisers, higher consumer prices, lower payments to publishers of online display advertisements, and reduced competition in the purchase and placement of such advertisements.

4.      Like the other class members, Plaintiff dealt directly with Google in its capacity as display advertising broker, having placed online advertisements using Google's services. Plaintiff, like the other class members, suffered economic losses due to Google's monopolization and seeks appropriate equitable relief and damages through this action.

## II.      JURISDICTION AND VENUE

5.      This Court has original jurisdiction over Plaintiff's federal antitrust claim under the Clayton Act, 15 U.S.C. § 15. The Court also has diversity jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member

is of diverse citizenship from Defendants, there are more than 100 class members nationally, and the aggregate amount in controversy exceeds $5,000,000.

6.      This Court has personal jurisdiction over Google for purposes of adjudicating Plaintiff's claim because (1) a substantial portion of the events described below have been carried out in this District, and (2) Google has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court proper and fair.

7.      Venue is proper in this District under 28 U.S.C. § 1391.  Google regularly conducts business in this District, and a substantial part of the events giving rise to Plaintiff's causes of action occurred in this District.

**III.    PARTIES**

**A.     Plaintiff**

8.      Plaintiff Royal Disposable Medical & Safety Supplies, Inc. d/b/a Royal Dental Supply ("Royal Dental Supply") is a private dental supply business based in Miami Garden, Florida, and organized under the laws of Florida. Royal Dental Supply paid Google directly for the placement of digital advertisements during the class period.

**B.     Defendants**

9.      Defendant Google LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Mountain View, California.  Google LLC is a technology company that provides internet-related services and products, including online advertising technologies and a search engine.

10.      Defendant Alphabet Inc. is a corporation organized under the laws of Delaware with its principal place of business in Mountain View, California.  Google LLC is a wholly-owned subsidiary of Alphabet.

11.      Google LLC and Alphabet Inc. are collectively referred to herein as "Google."

3

IV.     **FACTUAL ALLEGATIONS**

A.     **Overview of Digital Advertising**

12.     Businesses have long relied on advertising to promote their products, generate brand awareness, and increase sales.  Advertising campaigns previously were planned and managed by media buyers.  If a media buyer needed to help a toy manufacturer reach parents of children, she might place an ad in *Parents Magazine*, or in the family section of the local newspaper.

13.     Digital advertising today works differently.  The internet allows businesses to target potential customers with greater precision.  Digital advertising is the promotion of products and services via the internet through search engines, websites, social media, and other platforms that can be accessed online.  It is automated and data-driven, involving data scientists, mathematicians, and computer programmers who, behind the scenes, use advanced statistical tools to optimize advertising campaigns, micro-targeting users and constantly tweaking algorithms.

14.     Digital advertising is now the fastest growing segment of the advertising business in the United States.  More than half of all advertising money in the United States is now spent on digital advertising—approximately $129 billion in 2019.

15.     The two overarching markets in digital advertising are search advertising and display advertising.

16.     Search advertising is the placement of advertisements in or near the organic search results generated by a search engine, predominately Google Search.  The advertisement targets those who are actually searching for a product or service; the advertisement appears when a consumer performs a search that is related to the product or service offered by company sponsoring the advertisement.  The advertiser only pays when the user clicks on the

advertisement.  For example, if a user searches for sandwich delivery, the search advertising
results may look like this:



17.    Search advertising is designed to reach customers who have already shown an
interest in purchasing a product or service and may be close to making a purchasing decision.  If,
for example, someone finds herself locked out of her house and searches for nearby locksmiths
on Google Search, search advertising will place ads for local locksmith services above the
organic search results.

18.    Search advertising is limited, however, to prospective customers who
affirmatively search for their product or service, or for something similar.

19.    Display advertising, in contrast, is the advertising that appears alongside content
on websites.  Unlike search advertising, which is generally limited to text, display advertising
comes in many forms, including banners, images, and videos.  For example, an ad for Dove soap
might appear as a banner or sidebar on the cooking website "myrecipes":



Or as side bar ads, like this:




20.     With display advertising, the internet user need not perform a specific search for the particular product or service.  Instead, the key to effective display ads is placing them on websites likely to be viewed by the advertiser's target audience or by those most likely to purchase the advertised products or services.  A running shoe company, for instance, would prefer to have its advertisements appear on sporting goods websites as opposed to websites selling car parts.

21.     Suppliers of display advertising are website operators and are known as publishers (*e.g.*, providers of online news sites and other content creators).  Publishers employ third-party tools to find advertisers willing to purchase advertising space available on their websites.

22.     In 2019, $69.9 billion was spent on digital display advertising in the United States.  And 85% of that display marketing was programmatic advertising, 90% of which was

executed through programmatic "real-time bidding."  In 2020, spending on display media is expected to reach $81.3 billion, a 14% year-over-year increase.

23.     Display advertising accounts for approximately half of the digital advertising market, and many web publishers rely on display advertising for a major source of their revenue.

24.     Search advertising and display advertising serve different purposes, and advertisers do not regard them as substitutes for each other.  The Interactive Advertising Bureau—an advertising organization that develops industry standards and conducts research for the advertising industry—separates display and search for purposes of gathering and reporting annual revenues in these distinct advertising markets.

> **B.     Google Dominates and Controls Digital Advertising Services Markets**

25.     Google is the dominant supplier in the search advertising market and has moved rapidly to control all stages of the display advertising market as well.  In 2019, Google's corporate parent Alphabet earned $133 billion, 82% of its total revenue, from search and display advertising.

26.     Google's revenue derived from display advertising comes from ads placed on Google's own properties (Google Maps, Gmail, etc.) and from acting as an intermediary in the sale of ad space on third-party websites to advertisers.

27.     One of Google's primary sources of revenue derives from its activities as the broker between publishers and advertisers in programmatic display advertising.  When an ad is viewed on a third-party publisher's site, such as the *New York Times* website, Google pays the publisher a share of the amount the advertiser paid to Google.  The amount of revenue Google earns from display advertising is thus dependent on the number of ads it sells, the price of those ads, and Google's percentage margin or "cut" of the deal, also known as the "take rate."

28.     The "take rate" is the difference between what an advertiser pays for an ad and what portion of that payment the publisher of the ad receives for placing the ad on its website. Google's take rate as an intermediary is typically 54-61%; but when ads are presented on Google products, such as Google Search or YouTube, Google keeps the entire price of the ad.

29.     Google has a strong incentive to increase the number of ads placed on its proprietary sites, to charge advertisers higher prices, and to pay as little as possible to publishers displaying ads placed through Google on their websites.

1.      **Google's Search Advertising Practices and Market Share**

30.     As the owner of the dominant online search platform, Google is by far the largest supplier of digital search advertising in the United States.  Over the last ten years, Google's share of the digital search advertising supply has ranged between 89% and 93%.

31.     Google makes space on its search result pages available to advertisers through an auction process that occurs each time a user runs a search.  Google starts the auction by first finding all the ads with keywords matching the search.  It then excludes ads that are considered ineligible based on certain criteria, such as country restrictions.  Google then only displays ads with a sufficiently high "rank" based on a combination of factors, such as the advertiser's bid, the quality of the ad, user location, and the device the user is using.  Because the auction process is repeated for every search performed on Google Search, different auctions may lead to different advertisements being displayed.

32.     Although Google claims that it prices its search advertising through an auction, Google controls (and frequently raises) the price of its search advertising by setting a high reserve price.  Doing so enables Google to directly set the price of its search advertisements because an ad will not sell unless its price meets or exceeds the reserve price, which thus

operates as a floor.  A majority of the winning bids for Google Search ads are at the reserve price.

### 1.       Google's Dominance in the Ad Tech Stack and Display Advertising

33.     Google is also a major supplier of programmatic display advertising and owns multiple products that supply it.  YouTube, owned by Google, alone accounts for about 10% of the entire supply of display advertising.  Other major Google products, such as Google Maps and Google Play, also offer display advertisements.

34.     Approximately 86% of online display advertising space in the United States is bought and sold in real time on electronic trading venues, referred to in the industry as "advertising exchanges" or programmatic real-time bidding.  Google owns and operates the dominant ad exchanges.

35.     The role of the ad exchange is critical in display advertising.  Exchange transactions are the means by which website publishers monetize the attention they earn from web users and advertisers can maximize the impact of their ad dollars.  For ad exchanges to be competitive and transparent is therefore essential to parties on both sides of the ad stack.

36.     Relying on intermediaries like Google that route buy and sell orders from advertisers and publishers, the structure of the ad market resembles the structure of electronically traded financial markets.  In display advertising, a single company, Google, simultaneously functions as the key intermediary through which buyers (advertisers) and suppliers (publishers) of display advertising trade, and as a leading publisher of advertisements.

37.     When an internet user clicks to visit a web page, in the milliseconds that it takes for that page to load, real-time auctions are occurring in the background to determine which ads to display on the web page *that particular user* will see.  These auctions are run by supply side platforms (SSPs) and demand side platforms (DSPs) in the ad tech stack described further below.

38.     On the supply side of the exchange, suppliers—online publishers—of display advertising employ publisher ad servers (PAS) to accept, store, and manage ads; choose where and when ads appear; and track the effectiveness of ad campaigns.  Each specific ad placement is determined based on bids from advertisers and/or preexisting arrangements between publishers and advertisers.  Publishers rely on supply side platforms (SSPs) to run auctions, interface directly with their demand side equivalents, and optimize available inventory.

39.     The demand side is comprised of advertisers and media agencies running advertising campaigns for businesses.  Advertisers and media agencies rely on advertiser ad servers (AAS) to store ads, deliver them to publishers, and record transactions.  Advertisers and media agencies also employ demand side platforms (DSPs) to purchase digital advertising by bidding in auctions and to manage their bids.

40.     Together, the publisher ad servers (PAS), supply side platforms (SSP), advertiser ad servers (AAS), and demand side platforms (DSP) comprise what is known as the "ad tech stack."  By connecting publishers and advertisers, an ad tech provider functions as an intermediary or broker.  The U.K.'s Competition and Markets Authority (CMA) depicted this display advertising ecosystem with the following image:



41.     Until fairly recently, different firms provided the various services in the ad tech stack, and intermediaries did not own publishers or advertisers.  Google lagged behind the pace

of innovation and was not a key player in the development of online ad exchanges.  Early players in virtual ad auctions recognized it was most efficient to interoperate with competitors and maintain a level playing field so that customers could mix and match products.  During Senate testimony on September 15, 2020, digital marketing expert Adam Heimlich compared transacting in those earlier auctions to "owning a stall in a vast open air market"—transparency was at a level where market participants could easily compare features, quality, and price with those of other participants within reach, and could use ad stack services provided by a variety of providers.  This is no longer the case.  After a series of acquisitions, Google now dominates and controls the ad stack as a whole.

42.    Before Google's entry, ad exchanges generally operated as disinterested brokers, similar to stock exchanges.  Google, however, saw the market efficiency of these early exchanges as a threat to its primary business of selling ads.  It soon turned to a sustained mergers and acquisitions strategy to gain market dominance.  Google's acquisitions gave it access to and made it a major player in every level of the display advertising service industry, and have enabled Google to exclude competition through a variety of anticompetitive policies and activities.

43.    Since 2007, Google has made at least nine key acquisitions in the interest of taking control of the entire ad tech stack.  In 2007, Google purchased the leading ad server, DoubleClick, which provided the basic technology for Google's current PAS.  In 2009, Google acquired AdMob, the largest ad server for the then-nascent mobile application market, which has since grown exponentially.  The technology from Invite Media, which Google acquired in 2010, was converted into Google's main DSP.  In 2011, Google purchased AdMeld, one of the largest SSPs in the display advertising industry, which it integrated into AdX, Google's existing

exchange.  And in 2014, Google bought Adometry, an analytics and attribution provider it then integrated into Google Analytics. Together, these acquisitions reveal a business objective of occupying the entire ad stack as well as the connected analytics market through mergers.

44.     A 2010 document that Google produced to the House of Representatives shows that Google acquired companies to absorb its competition and combine products along the ad stack instead of competing on the merits.  Discussing Google's potential development of a demand-side platform for advertising agencies (a "bidder"), the executive in charge of Google's display business wrote in an internal email: "The primary benefits on having a bidder are eliminating the disintermediation risk and substantially increasing display spend with Google from agencies (through the combined use of DFA – bidder – AdX). . . . We are looking at options to accelerate this (potentially through M&A for example)."

45.     DFA refers to Google's ad server; AdX was Google's exchange.  The "disintermediation risk" that Google sought to eliminate resulted from the competitive, transparent conditions in the digital advertising exchange market at the time, which diverted ad money away from Google.  Thus, Google's plan was to combine products to increase its revenue from "display spend" and lock in bidders to its new and consolidated intermediation services along the ad stack.

46.     Google's merge-to-monopolize strategy worked.  On the supply side, Google now holds at least 90% of the PAS submarket through multiple products such as Google Ad Manager and Google DoubleClick for Publishers.  Since taking the dominant position in the PAS submarket, Google began merging its supply-side intermediation products with its PAS offering. The composite product "Google Ad Manager" combined Google's PAS with its SSP and associated ad exchange.  For the SSP and associated ad exchange submarket, Google holds a 50-

60% share.  On the demand side, Google also controls a substantial majority of the DSP submarket.  Google holds a 80-90% share of the AAS submarket as well.

47.     Because of Google's market dominance, publishers and advertisers have little choice but to use Google's intermediation services.  Nexstar Media Group, Inc., the nation's largest local news company, tested what would happen if it stopped using Google's technology to place ads on its websites.  Over just a few days, the company's video ad sales plummeted.

48.     Google further consolidated its monopoly across the ad tech stack through a series of product mergers, whereby it bundled two distinct products together and rebranded the integrated entity as a single product: first merging its PAS with its SSP to create Google Ad Manager, and then merging its AAS with its DSP to create Display & Video 360.  Each of these mergers reflects or resembles an unlawful tying arrangement.  Each increased switching costs for advertisers (as well as barriers to entry for competitors) for services that already carried high switching costs.  In the case of Google Ad Manager, Google's PAS, which held as much as a 90% market share, was the tying product while Google's SSP, which at the time held a 40-60% share, was the tied product.  Similarly, with Display & Video 360, Google's AAS was the tying product while its DSP was the tied product.

**C.     Google Used Its Market Power to Create and Maintain a Monopoly for Display Advertising Services**

      **1.     Google's Dominance with Its Search Engine and Chrome Browser and the Significance of User Data in Targeted Advertising**

49.     Google operates the default internet search platform in the United States.  More than 90% of all internet searches are conducted through Google Search.  Further, Google's web browser, Google Chrome, occupies about half of the U.S. browser market.

50.     Google has an enormous advantage over advertisers and publishers owing to the sheer volume of information it acquires about consumers through its integrated panoply of

products and services.  This data include browsing histories from Google Search and Google's Chrome web browser, and location data from Google Maps, Waze, and Google's Android operating system embedded in hundreds of millions of smartphones.  As Google's former CEO Eric Schmidt boasted, "We know where you are.  We know where you've been. We can more or less know what you've been thinking about."

51.     Online advertising is more effective when it is targeted, displaying products or services a user is more likely to want.  Accordingly, user data—including gender, age, location, and browsing history—influence not just the types of ads a user will see, but also the prices advertisers are willing to pay.  "The exact same ad, on the same website, at the same time, could be worth vastly different amounts to two different buyers depending on how much they know about the consumer being targeted," explained Ari Paparo, a former Google executive who founded the advertising company Beeswax.  "User data is everything."

52.     The prices that any company is able to fetch for ads that it displays online depend on two crucial factors: the ability to identify *who* is loading the page or mobile application, and the subsequent ability to connect the user's identity with more information about them.

53.     The targeting of display ads begins the moment a user clicks to visit a web page. Typically, the user's IP address and location, along with the URL of the web page, are swiped from the user's browser without their explicit knowledge.  This information then informs the instantaneous ad auctions that occur in the split second before the web page appears to the user. The goal is to build and deploy as specific a portrait about the user as possible, primarily by linking their device with their identity.  Web cookies, tags, and "fingerprinting" of mobile devices are common tools for doing so.

54.     If a publisher or company that sells online ads can know what a user is viewing on *other* sites, the publisher can target the user based on that information when the user returns to the publisher's own site.  Because of its dominance, including in search, Google can track users' visits to at least 70% of the top one million sites on the internet.  Google has tags (including as a third party) tracking user behavior on over 80% of popular websites.  Among other consequences of this data-gathering supremacy, Google is better able to demonstrate the effectiveness of using its advertising platforms relative to others, which creates a barrier to entry for potential rivals.

55.     To illustrate Google's vast advantage over any other publisher in accessing and monetizing data, consider two hypothetical online publishers, CNBC and *The New York Times*. Suppose, for example, that a user named Mary visits CNBC's website in the mornings, where she reads about financial markets, and visits *The New York Times* in the evenings to read the book review section.  CNBC knows that Mary follows financial markets and might monetize her view at a $30 CPM (cost per thousand impressions).  The *Times* knows that Mary likes to read books and might only monetize her at a $10 CPM.  If the *Times* can somehow find out that Mary is reading CNBC in the mornings, then when Mary visits the *Times* book review section in the evening, the *Times* can target her as someone who follows the markets and monetize her at $30, too.

56.     Since the two are competitors in the supply side of the display advertising market, CNBC would not want to share with the *Times* what Mary reads on cnbc.com.  If CNBC is selling ads to its audience of financial readers at a $30 CPM, and the *Times* can access CNBC's readers and their reading patterns, then the *Times* could undercut CNBC and sell ads targeted to CNBC financial readers for, say, $25 instead of $30.

15

57.     Google uses its ability to track users across the web to extract a large advantage in display advertising markets.  Google tracks users through its analytics and ad-serving products, which it consolidated and rebranded as the Google Marketing Platform.  Publishers like CNBC and the *Times*, however, have no choice but to share user tracking information with Google, which acts as both their ad broker and supply-side competitor.

58.     Google's exclusive access to its proprietary data from Chrome and Android further widens its substantial advantage over other publishers.  Google relies on this data, which is generally unavailable to competing bidders, when bidding on its own ad exchanges to win contracts to display ads.

59.     Moreover, while digital ads trade on several auction markets, Google ensures that its own display advertising inventory can only be bought through its *proprietary* auctions.

60.     Having consolidated key portions of the ad tech stack for display advertising, Google now readily brokers transactions on both sides of this market, and can steer advertisers to its *own* display supply platforms like YouTube.  As the U.K.'s CMA concluded in a report issued on July 1, 2020, "Google's strong position at each level of the intermediation value chain creates clear conflicts of interest, as it has the ability and incentive to exploit its position on both sides of a transaction to favour its own sources of supply and demand."

### 2.     Google's Market Dominance and the Resulting Harm to Purchasers and Sellers of Online Advertising

61.     With over 90% of internet searches using Google's search engine, Google is the dominant source for search advertising.  As a result, companies seeking to promote their products or services online have little or no choice but to purchase search advertising space from Google.  Google has taken advantage of this dominance in the search advertising market to drive out competition in the separate market for display advertising services.

62.     When a Google Ads account is established for use in placing search advertisements, Google Ads is set as the default account for placing both search and display advertisements.  Google also blocks advertisers from using third-party DSPs to purchase Google Search inventory, which is sold primarily through Google AdWords.  And to further disadvantage rivals, Google restricts access to data concerning web searches performed on Google Search.

63.     When consumers run Google searches, Google collects and retains data related to the searches.  For example, Google Ads (a DSP) relies on algorithms that match keywords selected by advertisers to user search terms to determine which search ads pop up after which searches.

64.     DSPs and advertisers use this information to craft more effective advertising campaigns.  Google, however, withholds this information from rival DSPs and advertisers using rival service providers.  The result of this policy is that, to gain access to the search data over which Google has monopoly control, an advertiser must agree to use Google's products *in the separate display advertising* services market.

65.     In addition, Google offers a product known as Ads Data Hub (ADH) that allows advertisers to view data from ad campaigns, including which users their search advertising campaigns reached, and to combine that data with internal or third-party data to set or adjust display advertising strategy.  Nevertheless, the ability to use Google's ADH data comes with a built-in restriction: the data can only be sent to another Google service and cannot otherwise be exported.

66.     Likewise, on the supply side, Google restricts publishers' ability to access the bid data required to compare the performance of Google's SSP with rivals.  And Google does not

reveal its own fees and commissions on transactions to other market participants.  This lack of transparency that Google has unilaterally imposed across the ad stack undermines the ability of advertisers and publishers alike to make the informed decisions necessary to drive competition.

67.     Google similarly uses its dominance in the video-ad publishing market segment to coerce advertisers to use Google's display advertising services.  Google-owned YouTube is Google's most valuable display property.  About half of all video display ads not appearing on Facebook and Amazon appear on YouTube.  After Google purchased YouTube, it initially made YouTube's inventory of display advertisements available to any advertising service provider.  But in 2015, Google took YouTube off the digital ad exchanges, restricting its ad inventory to being purchased *only through Google's* brokering channels and bidding tools.

68.     Consequently, advertisers can no longer purchase YouTube inventory using a third-party DSP.  If an advertiser wants to purchase any of the valuable advertising space on YouTube, it must use Google's advertising services and cannot use any of Google's rivals' advertising services.

69.     One rival described Google's requirement that Google services be used to place ads on YouTube as "the beginning of the end," noting that "Google used its monopoly on YouTube to put its hand on the scale" unfairly.  Sen. Amy Klobuchar (D-MN) observed that this change "of course had a crippling effect on Google's rivals" and "not only forces YouTube's ad inventory into Google DSP, it also had the effect of driving non-YouTube ad volume to Google and away from the rival DSPs."

70.     In 2018, Google began restricting third-party ad servers from tracking viewing activity on YouTube, making Google-owned Display & Video 360 the only service available to analyze YouTube advertising data.  This action effectively tied YouTube to Google Ads and

Display & Video 360, preventing advertisers from using competitors' products to serve *or* analyze ads on YouTube, one of the world's most important publishing platforms.

71.     Google's leveraging of its position in forums in which it is the dominant ad publisher restrains competition with an enhanced effect because advertisers almost always use a single DSP for a given advertising campaign.  Advertisers use a single DSP for a campaign largely because doing so allows them to manage frequency caps (limits on the number of times the same user is shown an ad) during the campaign and facilitates audience management and reporting.  Thus, if an advertiser wished to advertise on YouTube, Google Search, *and* other publisher websites, the advertiser would bear significant costs and inefficiencies from selecting a different advertising service provider to broker distribution of the ad campaign into each forum.

72.     Even if an advertiser preferred to use multiple DSPs, Google does not permit it to use third-party DSPs to purchase Google Search inventory, which is sold primarily through Google AdWords, or Google's YouTube inventory as discussed above.  Because Google Search and YouTube, in addition to digital display, are essential to many online ad campaigns, Google is able to use its "must-have" inventory to tether advertisers to its DSP.  And because advertisers typically use one DSP per ad campaign, a display advertiser that wants any of its ads to appear on YouTube or Google Search must use Google's DSP for the entire ad campaign.

73.     Advertisers have suffered harm by paying higher prices due to Google's monopoly in display advertising.  A 2018 study by eMarketer, which focused on programmatically purchased ads across the open internet—i.e., excluding Facebook and other close-ended online platforms—found that programmatic ad prices have risen meaningfully across all major display categories: desktop, mobile, mobile app, and video.  As of 2018, the

average digital advertisement sold for 12% more than it did in 2016, a price increase five times the rate of inflation.

74.     The higher prices have greatly benefited Google, but advertisers now receive less for each dollar they spend.  Advertisers have seen progressively lower returns on their digital advertising investments as Google built and reinforced its monopoly along the ad tech stack.  Publishers, too, have lost ad revenue because Google's entrenched monopoly has enabled it to take a comparatively larger cut of advertisers' payments for the placement of ads.

75.     Google's reserve-price practices also cause advertisers to pay higher prices.  In its online ad auctions, Google sets a reserve or floor price, which corresponds to a minimum bid that is needed to win a particular ad placement.  If none of the bids exceeds this reserve price, the winning bidder *must* pay the reserve price—a price that, by definition, is higher than the price that would have won the placement in an auction in which Google had not set a floor price.  In fact, the majority of winning bids by advertisers are at the reserve price.  And it is the lack of competition from other ad auctions that has allowed Google to impose these supra-competitive floor prices.  At the same time, Google denies advertisers access to data they would need to accurately measure the success of their advertising campaigns and negotiate for lower prices.

76.     When Google brokers a display ad, it typically takes well over a third of the total amount paid by advertisers in fees.  This is inefficient: a substantial portion of these fees are monopoly rents.  Competitive market conditions would serve to reduce fees.  Market participants such as advertisers and newspapers also lack visibility into the fees charged along the entire supply chain, which limits their ability to make optimal choices about how to buy or to sell inventory.  A market participant testified to the House Subcommittee on Antitrust, Commercial, and Administrative Law that "Google could make the process 'more transparent,' but given

Google's financial stake in maintaining secrecy, 'there is no incentive to do so.'" The secretive nature of Google's fees inhibits efficient transactions and further reduces competition among intermediaries.

77.     The foreclosure of competition in digital advertising markets resulting from Google's monopoly has harmed the public at large.  When advertisers pay supra-competitive fees to brokers like Google for placing ads, they pass on a portion of those costs to their customers by marking up the prices of their goods and services.  And when publishers receive anticompetitive underpayments for running ads, they are often forced to cut costs, including through layoffs, and hence cannot produce content of the same quality or variety.  By eliminating competition, Google's display advertising monopoly also has reduced the incentive to innovate in these markets and thereby deprived the public of the benefit of improvements in advertising services and delivery.

**D.     Google Created and Has Maintained its Monopoly for Display Advertising Services by Restricting the Ability of Rivals to Compete on Equal Footing**

78.     Google has engaged in a number of anticompetitive practices to disadvantage its rivals and cement its dominance in the display advertising services market.

79.     For instance, using Google's ad server, formerly called DoubleClick for Publishers, was for many years the only way to obtain full access to Google's AdX exchange. That access was critical for publishers because AdX connected to AdWords, and the ability to access AdWords greatly expanded publishers' access to advertisers as a result of Google's dominance in search.  As the *Wall Street Journal* reported, "[f]or many years, Google's AdX was the only ad exchange that had access to" Google's AdWords platform and its many advertisers.  Thus, for example, when News Corp considered switching from Google to a different company to facilitate its ad-serving business, it reportedly "felt it would jeopardize the

40% to 60% of advertising demand it gets from Google's ad marketplaces . . . ." According to the *Journal*, Google in 2018 merged DoubleClick for Publishers and AdX "into a single product called Google Ad Manager, making it plain to the industry that they are indeed linked . . . ."   In short, Google used its dominance in search advertising to pursue and obtain a monopoly in display advertising.

80.     Moreover, a primary monopolistic practice that Google employs is denying interoperability—that is, the ability of its own advertising service systems to interface with the systems of rival advertising service providers.  While Google has publicly claimed that publishers can "mix and match technology partners," that is false in several important respects.

81.     Google denies interoperability with its rivals to squelch competition that would otherwise occur within Google's SSP system.  When accepting bids from advertising services, Google's SSP is designed to operate more efficiently with Google's own advertising service.  Although Google's SSP can accept bids from non-Google advertising services, Google's SSP is inefficient at processing those bids, and they are therefore disadvantaged as compared to bids submitted by Google's own advertising service.  As the U.K.'s CMA explained in its July 1, 2020 report, if a publisher "uses a non-Google ad server, AdX would not participate in a real-time auction with other SSPs, but would compete with an 'expected' price, which determines the order in which SSPs are sent an ad request" and "is inefficient for the publisher."

82.     Google also imposed new restrictions on publishers' ability to set differential price floors, preventing them from calibrating different pricing for different SSPs or DSPs.  This change had its intended result of driving more intermediation business to Google on the sell side because publishers could no longer set higher floor prices for Google than for other sources of demand.

22

83.     Still another example of Google's exclusionary conduct involves technology called header bidding, a system designed by Google's competitors on the sell side to compete with Google's display advertising exchange.  Google responded to header bidding not by accepting the free and open competition it otherwise would have fostered, but by preventing its systems from working with the javascript code that publishers usually placed on their websites to enable header bidding.  The result of this lack of compatibility was that the publisher would first notify non-Google exchanges and the winning bid would be sent to Google as if it were a pre-existing contract price.  Thus, instead of submitting a blind bid to the publisher for how much the publisher would be paid to place an ad on its website, Google would separately receive the bids submitted by *other* service providers and then submit its *own* bid, knowing the minimum price it would need to outbid its rivals.  This rigging gave Google a significant advantage over its rival brokers because, unlike Google, they would need to submit aggressive bids to ensure their bid was the most attractive—and even then Google could outbid them to win display advertising business.

84.     Google's rivals lacked Google's market dominance and therefore could not make their systems incompatible with header bidding as Google did.  Had they done so, a publisher simply would not have received bids from them.  Even after Google permitted non-Google service providers to integrate with Google's "Open Bidding" system—its exclusionary response to header bidding— Google charged the winning bidder 5-10% of the winning bid, thereby increasing the costs to Google's rivals of merely attempting to compete with Google.  This structure also gives Google a systematic advantage in bidding to place ads because it does not charge itself these fees.

85.     Similarly, when Google launched its Accelerated Mobile Pages, or "AMP," it made the pages incompatible with header bidding, coercing publishers to use Google's Open Bidding system.  And to further repel competition created by header bidding, Google began conditioning premium treatment on Google Search (*i.e.*, being featured at the top of search results) upon publishers migrating to AMP and foregoing the use of header bidding.

86.     As Mr. Heimlich, the digital marketing expert, described in his Senate testimony, "Google became the only display company not hobbled by the exclusions and restrictions it'd placed on everyone else.  The power to interoperate among buy-side, sell-side and measurement software went from being a feature of the exchange ecosystem to a capability exclusive to Google."  That exclusive capability fortified Google's power to exclude rivals and allowed it to further boost its share of the display advertising services market, unfettered by any meaningful competition.

**E.     Google Supports Its Display Advertising Monopoly with Anticompetitive and Harmful Conduct**

87.     Google also routinely engages in such anticompetitive conduct as failing to disclose key market information to publishers, advertisers, and potential competitors, and designing auctions to entrench its market dominance and drive up costs for its rivals.

88.     Google maintains a culture of secrecy around its advertising services, a culture made possible by its market power.  When acting as an intermediary Google conceals key information from both publishers and advertisers.  Parties on both sides of the transaction are not aware of the price actually paid to Google for an ad placement.

89.     Google redacts its take rate from trading or auction records on both the buy-side and the sell-side.  Service providers in competitive markets, by contrast, generally must furnish their customers detailed accounts of the services they are providing to justify the prices they

24

charge.  Studies have shown that about 15% of display advertising transaction costs are
unaccounted for: these are Google's monopoly rents.

90.     The general consensus among advertisers and publishers is that the "ad tech tax"
is high, particularly in comparison to non-programmatic ad markets.

91.     Google refuses to disclose even basic information to other participants in the ad
tech stack, causing market-distorting inefficiencies that solidify its grip on display advertising.
Google fails to provide basic information about the cost of ads on its platforms, such as the fees
it charges for each transaction along the ad stack.  In surveys conducted by Association of
National Advertisers (ANA) estimating take rates, participants reported it was very difficult or
impossible to obtain transaction-level pricing data.  This lack of transparency makes it harder for
publishers to negotiate with advertisers, and for potential competitors to compete with Google.
Google also removes time-stamp information on bids, which publishers previously had used to
optimize their pricing.  Moreover, Google conceals information about the performance of the
digital ads it brokers, such as how many impressions are shown to actual users, as opposed to
bots.  Google's multiple failures of transparency reinforce its power in the display ad market and
prevent advertisers from knowing if they are wasting some of their spend.

92.     As discussed above, Google has ready access to enormous amounts of consumer
data. At the same time, it has acted to make it harder for its competitors to obtain similar
information.  In January 2020, for instance, Google announced that it would "phase out" the
third-party cookies in its Chrome browser that help advertisers target consumers based on
demographics, past browsing history, and other information.  Without access to third-party
cookies, it would be much harder for advertisers and competitors to bid rationally on ads.  Yet

that is not so for Google, which would continue to have other sources for gleaning robust data on consumers.

93.     In 2016, Google launched AMP for the stated purpose of loading web pages faster on mobile devices.  AMP is a framework that websites can use to create fast-loading mobile web pages. By limiting the types of programming codes that can be used on a page, AMP pages load faster than they otherwise would.  When a user clicks on an AMP link from Google Search, instead of being routed to the page on the third-party site's server, the user sees a cached version stored on Google's own servers via its Content Delivery Network.

94.     Google encourages publishers to use AMP web pages and lists them first in a search.  But, because the pages are *Google* pages, publishers are unable to gather data about their own users as they normally would.  For example, in the below image, the left side shows a *Newsweek* article on its own server.  The right side shows the same article, but on a Google-hosted page the user would see after clicking on the AMP-loaded link via Google Search:



**Left**: *Normal article*; **Right**: *AMP article loaded from Google Search*

95.     Google's strategy to host more and more content on its own servers demonstrates that Google views content providers themselves as long-term competitors for the capture of ad dollars.  More than half of the desktop searches on Google keep users on Google properties rather than prompting clicks to the rest of the web.  For mobile searches, 70% of Google searches keep users on Google properties. The percent of Google's revenue from advertising dollars spent on its own properties increased from 64% in 2007 to 85% in 2020.

96.     A report issued on October 6, 2020 by the House Subcommittee on Antitrust, Commercial, and Administrative Law states that, "in the context of Google's placement of news on accelerated mobile pages (AMP) . . . publishers raised concerns that 'Google effectively gave news publishers little choice but to adopt it,' requiring the creation of parallel websites 'that are hosted, stored and served from Google's servers rather than their own.'"

97.     Between 2007 and 2017, annual newspaper ad revenue dropped from $45 billion to $16 billion.  During the same period of time, Google's ad revenue skyrocketed.  A recent study by the News Media Alliance found that in 2018, Google gained over $4 billion in revenue from crawling and scraping news content, and running associated display ads, without paying the publishers for that use.  Such market arrogation represents the behavior of a monopolist.

F.     **Government Investigations and Actions Regarding Google's Monopolistic Activities**

98.     In July 2019, the United States Department of Justice announced that it had opened an investigation into whether Google is committing illegal monopolistic acts.  The DOJ stated that its probe would focus on whether and how Google and other leading online platforms "have achieved market power and are engaging in practices that have reduced competition, stifled innovation, or otherwise harmed consumers."

99.     DOJ's ensuing civil action—joined by eleven state attorneys general and filed in this Court on October 20, 2020—focuses on Google's monopoly conduct in the markets for online search, search advertising, and search text advertising.  The complaint of these governmental enforcers alleges that Google acted unlawfully to preserve these monopolies, including by ensuring that its search engine would be the preset default general search engine on hugely popular devices like Apple's iPhone and the devices running on its Android operating system.  Google used exclusionary agreements, tying arrangements, and "payoffs" to shore up its monopolies in search and search advertising, such that "competitors are denied vital distribution, scale, and product recognition—ensuring they have no real chance to challenge Google."  The governmental enforcers thus allege that "Google has created continuous and self-reinforcing monopolies in multiple markets."

100.    As a result of Google's monopoly conduct, the enforcers allege, consumers are "forced to accept Google's policies, privacy practices, and use of personal data; and new companies with innovative business models cannot emerge from Google's long shadow."

101.    The governmental enforcers further note that Google's conduct and internal messaging evidence its awareness of its status as a monopolist: "Google employees were instructed to avoid using terms such as 'bundle,' 'tie,' 'crush,' 'kill,' 'hurt,' or 'block' competition, and to avoid observing that Google has 'market power' in any market."

102.    The governmental enforcers seek, among other relief, "structural relief as needed to cure any anticompetitive harm" and an injunction forbidding Google's anticompetitive practices: "Absent a court order, Google will continue executing its anticompetitive strategy, crippling the competitive process, reducing consumer choice, and stifling innovation."

28

103.    The attorneys general of every state except Alabama are separately investigating Google for monopolization.  In September 2019, the attorneys general of 48 states, and of the District of Columbia and Puerto Rico, led by Texas Attorney General Ken Paxton, disclosed that they had opened an investigation into whether Google is violating the antitrust laws.  In announcing the investigation, Mr. Paxton referred to "evidence that Google's business practices may have undermined consumer choice, stifled innovation, violated users' privacy, and put Google in control of the flow and dissemination of online information."

104.    On May 15, 2020, the *Wall Street Journal* reported—based on information from "people familiar with the matter"—that "[m]uch of the states' investigation has focused on Google's online advertising business.  The company owns the dominant tool at every link in the complex chain between online publishers and advertisers."

105.    The Texas Attorney General served Google with extensive civil investigative demands for documents and information on September 9, 2019 and on June 22, 2020.  These demands focus almost exclusively on Google's business decisions and conduct in the market for display advertising services, i.e., the ad tech stack.

106.    On July 9, 2020, news media reported that the California Attorney General's Office had opened its own independent antitrust investigation of Google.

107.    On July 29, 2020, the House Subcommittee on Antitrust, Commercial, and Administrative Law of the House Judiciary Committee held hearings on the subject of "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google."  Google CEO Sundar Pichai appeared for questioning by members of Congress, including regarding whether Google has abused its position as the default web gateway with its dominant search engine.  The Subcommittee Chair, Rep. David N. Cicilline (D-RI), noted the

"harmful economic effects" of the market dominance of Google and the other companies under scrutiny for monopoly conduct: "They discourage entrepreneurship, destroy jobs, hike costs, and degrade quality."

108.    On October 6, 2020, the House Subcommittee issued a report entitled "Investigation of Competition in Digital Markets."  The report finds that, "[w]ith a sizeable share in the ad exchange market, ad intermediary market, and as a leading supplier of ad space, Google simultaneously acts on behalf of publishers and advertisers, while also trading for itself—a set of conflicting interests that market participants say enable Google to favor itself and create significant information asymmetries from which Google benefits."

109.    The House report recognizes that Google's series of acquisitions "enabled it to gain a controlling position across an entire supply chain or ecosystem.  Google's acquisitions of DoubleClick, AdMeld, and AdMob, for example, let Google achieve a commanding position across the digital ad tech market."

110.    On September 15, 2020, the Subcommittee on Antitrust, Competition Policy, and Consumer Rights of the Senate Judiciary Committee held a hearing on the subject of "Stacking the Tech: Has Google Harmed Competition in Online Advertising?"  Questioning Google's witness, Sen. Josh Hawley (R-MO) took note of its "enormous advantage in this ad stack that you control every single layer of."  Google controls "the entire ad stack from top to bottom," he further explained.

> And you're using your position in search and YouTube in order to give yourselves a dominant position in the ad stack, and not just on the demand side . . . but also on the supply side. . . . I think the concern is, is that you control YouTube and search, which are the dominant platforms; you control massive amounts of consumer data that you have harvested from your other consumer-facing platforms—Gmail, Google Maps, G-Suite, etcetera. You then use those advantages in the

ad stack at every single layer, every layer of which you exercise
dominance in.

Senator Hawley concluded: "This looks like monopoly upon monopoly, in a classic case of

tying."

111.    Senator Klobuchar added that "Google may be taking between 30 and 70 percent

of every advertising dollar spent by advertisers using its services, depriving publishers of that

revenue."  She also stated that, "[w]ith the benefit of hindsight, it seems obvious that [Google's]

acquisitions were undertaken by the company in order to add to its market share and without

explanation . . . other than for Google to establish and maintain the monopoly power it currently

has."

112.    Sen. Richard Blumenthal (D-CT) stated that Google has committed "quite

simply a stunning abuse of market power."  Senator Blumenthal termed Google's position in

regard to its digital advertising monopoly "indefensible," noting that

> in no other market does the same party represent the seller, the buyer,
> make the rules and conduct the auction. . . . Given that Google operates
> the exchange and it competes with publishers on that exchange, that is
> a classic risk of insider trading. If you compare it as Google has to the
> stock market, Google would have been prosecuted long ago for insider
> trading.

113.    Google has already met with significant regulatory action in Europe.  The

European Commission fined Google $2.7 billion in 2017 for rigging search results to favor its

own online shopping portal and $1.7 billion in 2019 for dictating to other websites how they can

display search results from Google's competitors.

114.    In December 2019, France's competition authority fined Google $166 million

following a lengthy investigation into Google's online advertising practices.  France sanctioned

Google for adopting "opaque and difficult to understand" rules for its ad platform and for

applying them in an "unfair and random manner."  According to *TechCrunch*, the French

governing body also found that "another element of Google ad rules could lead sites to favor a

content policy aligned with its own ad-funded services—thereby pushing online publishers to

adopt an economic model that deeds and benefits its own."  The French governing body

summarized its bases for fining Google as follows:

> [T]he French Competition Authority considers that the Google Ads
> operating rules imposed by Google on advertisers are established and
> applied under non-objective, non-transparent and discriminatory
> conditions. The opacity and lack of objectivity of these rules make it
> very difficult for advertisers to apply them, while Google has all the
> discretion to modify its interpretation of the rules in a way that is
> difficult to predict, and decide accordingly whether the sites comply
> with them or not. This allows Google to apply them in a discriminatory
> or inconsistent manner. This leads to damage both for advertisers and
> for search engine users.

115.    On July 1, 2020, the U.K.'s Competition and Markets Authority released a 437-

page report entitled "Online Platforms and Digital Advertising: Market Study Final Report."

The CMA found that Google has dominant market share positions at each level within the ad

tech ecosystem, with particularly high shares of at least 80% in both the publisher ad server and

advertising markets.  The CMA further found that Google "has been able to leverage the market

power from its owned-and-operated advertising inventory into the open display market and

within the ad tech stack, making it harder for third-party intermediaries to compete," and that

"greater competition and transparency would put downward pressure on" fees borne by

advertisers and publishers.  In addition, the CMA found that Google has deployed its dominant

market positions by engaging in "self-preferencing behaviour," such as precluding publishers

using Google Ad Manager from setting different floor prices for different buyers, a policy shift

that substantially increased "Google demand's win rate."

116.     In response to Google's attempts to justify its lack of transparency and other practices by invoking data privacy laws, the CMA observed that "Google itself" has proposed technologies "to allow targeted advertising without user profiling," and that Google has an obvious incentive to interpret data protection laws in a self-serving way to "entrench[] its own competitive advantage, including by denying third parties access to data that is necessary for targeting, attribution, verification and fee or price assessment" while preserving its own right to use that data within its "walled garden."

## V.     INTERSTATE TRADE AND COMMERCE

117.     Google's conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.

118.     At all material times, Google participated in the marketing, promotion, distribution, and sale of publication and advertising services for display advertisements in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

119.     Google's conduct also had substantial intrastate effects in that, among other things, Google's publication and advertising services for display advertisements were sold in each state, including California.  At least thousands of individuals in each state, including California, were impacted by Google's anticompetitive conduct.  As alleged below, absent Google's unlawful conduct, Plaintiff and class members within each state would have paid less or received more money for digital advertising services.

## VI.    RELEVANT MARKET

120.     Google's anticompetitive conduct has restrained competition in the market for online display advertising services, encompassing the overall system or process that connects

online advertisers and publishers (including Google).  This market, colloquially known as the "ad tech stack" or "ad stack," comprises various segments and is the relevant market that Google monopolized.

121.    The relevant geographic market is the United States.  Market participants recognize this in the ordinary course of business.  For example, Google offers display advertisers the ability to target and deliver ads based on the location of publishers or consumers in the United States.  Google also separately tracks display advertising revenue for the United States.  Plaintiff thus defines the class below to include advertisers and publishers within the United States who used Google's display advertising services since 2016.

122.    Google is the dominant provider of online search and search advertising in the United States—over 90% of internet searches are performed on Google's search engine—and used its dominant position in those markets to restrain trade in the separate market for display advertising services.

123.    The display advertising services market comprises advertising services and platforms, and publishing services and platforms.  Google has monopolized each of the relevant submarkets of the overall market for display advertising services, including the subsidiary markets for publisher ad servers, supply side platforms, demand side platforms, and advertiser ad servers.  Google's conduct had the intent and effect of suppressing competition in the display advertising services market as well as in each of its component submarkets.

124.    Google exerts market power at each level of the ad tech stack and holds monopoly power in this market as a whole.  Google controls well over 90% of the PAS submarket and more than half of the SSP and associated ad exchange submarket.  Likewise, on the demand side, Google controls 80-90% of the AAS submarket and at least 60% of the DSP

submarket.  Google has wielded its market power to integrate each submarket of the ad stack into a single set of bundled services, with the intent and effect of discouraging or preventing competitors (other display advertising services providers), publishers, and advertisers from selecting advertising service providers on a component-by-component basis.  Google's anticompetitive conduct has foreclosed competition, eliminating the ability of each segment of the display advertising services process, and the process as a whole, to function as a free and independent market.

125.    Digital display advertising on the open web is a "market" for purposes of antitrust law even though advertisers may engage in other forms of digital advertising as well—just as advertisers might purchase space not only in magazines but also on billboards.

126.    There is no reasonable substitute for display advertising services.  While an advertiser may connect directly with a publisher to negotiate the placement of advertisements onto the publisher's supply of advertising space, for the vast majority of advertisers and publishers doing so is impractical.  Aside from the limited circumstances in which publishers and advertisers negotiate directly, publishers and advertisers must use third-party display advertising services.

127.    Nor is online display advertising substitutable with traditional forms of advertising, such a print, television, radio, or billboard advertisements.  Each of these forms of advertising reaches a distinct group of potential customers, and advertisers and advertising agencies view each of these forms of advertising as complementary rather than as potential replacements for each other.  Digital advertising also is different in kind from traditional forms of advertising, including because digital advertisements can be continuously updated and improved based on data showing how consumers are responding.  As the DOJ and eleven state

attorneys general observe in their complaint, "'offline' ads such as newspaper, billboard, TV, and radio ads cannot be targeted at a specific consumer based on the consumer's real-time, self-disclosed interests."

128.    In addition, online display advertising is not substitutable with online search advertising.  The two forms of advertising perform different roles and are treated as distinct by advertisers.  Search is intent-based advertising that seeks to induce consumers who have already shown an interest in buying a product or service to make a purchase.  Display, in contrast, is suitable for raising awareness about a product, service, or brand and reaching new audiences that may not yet have shown an interest.

129.    The government enforcers note in their complaint that display advertising, in contrast to search advertising, does "not enable advertisers to target customers based on specific queries and are generally aimed at consumers who are further from the point of purchase."  The enforcers' complaint also quotes the statement of Google's Chief Economist that "[o]ne way to think about the difference between search and display/brand advertising is to say that 'search ads help satisfy demand' while 'brand advertising helps to create demand,'" and "[d]isplay and search advertising are complementary tools, not competing ones."

130.    Furthermore, the market for display advertising services is separate and distinct from the market for advertisement inventory—*i.e.*, the spaces on websites that publishers make available for advertisers to purchase.  At least thousands of companies act as publishers with display advertisement inventory, but in general, these companies do not offer the services that facilitate placement of advertisements into the supply of display advertising space.  Only a few companies—Google chief among them—now provide display advertising services.

36

131.    There are high barriers to entry for the display advertising market and its component submarkets.  Entering any of these markets requires a substantial investment to develop and implement the technology necessary to compete.  Consequently, "advertisers and publishers alike have few options when deciding how to buy and sell online ad space," concludes the recent House Subcommittee report on competition in digital markets.

132.    Google's conduct, such as leveraging its internet search platform dominance and denying interoperability in several respects, as described above, has made it exponentially more difficult for would-be market participants to effectively enter these markets and compete with Google.  As such, Google has used its market dominance to ensure that market entry by would-be competitors is infeasible.  And Google's conduct, moreover, has made it impractical for existing market participants to compete—which has resulted in large numbers of companies exiting the relevant market.

133.    The display advertising services Google provides *connect* independent entities—advertisers and publishers.  In other words, advertisers use display advertising services to gain access to a range of publication options.  Publishers, in turn, use display advertising services to access a range of potential advertisers.  Google operates in an open-ended market in which it facilitates the transactions between advertisers and publishers.

134.    By contrast, companies like Facebook, Twitter, and Snapchat primarily host social media content, while Amazon primarily operates an online market for goods.  These web businesses are suppliers of their own ad inventory only and have close-ended, in-house display advertising systems that they use to publish advertisements on their own sites.  Those services are not available to other publishers.  To advertise on the open web—rather than, for example,

on Facebook or Amazon—an advertiser must engage with the ad tech stack that Google dominates.

135.   As the House Subcommittee report explains:

> Within display advertising there are two separate "ad tech" markets . . . first-party and third-party. "First-party" platforms refer to companies such as Facebook, Twitter, and Snap which sell ad space on their own platforms directly to advertisers. . . . Third-party display ad tech platforms are run by intermediary vendors and facilitate the transaction between third-party advertisers, such as the local dry cleaner or a Fortune 500 company, and third-party publishers, such as *The Washington Post* or a blog.

136.   The close-ended advertising services offered by Facebook, Amazon, Twitter, and Snapchat (among other web businesses) are not, therefore, reasonable substitutes for the open-ended system Google offers. "Programmatic" CPM ads thus are distinguished from "social media" CPM ads in the digital advertising industry.

## VII.   ANTITRUST IMPACT

137.   Google's conduct set forth herein had the purpose and effect of excluding competition in the relevant market. Absent Google's conduct, each segment of the display advertising market would have been significantly more competitive and class members would have financially benefited from that increased competition.

138.   Google's monopoly conduct has caused ongoing and durable harm to competition in the display advertising market. Google's monopoly power has enabled it to raise its prices above the competitive level to advertisers and, in turn, pay lower than competitive prices to publishers. Google has extracted monopoly rents in the form of fees it does not fairly disclose to other market participants.

139.   A competitive market would have benefited both the advertisers and the publishers that use display advertising services. Firms that provide display advertising services

make money in a variety of ways, including by retaining the difference between (1) what an advertiser pays the provider to place ads, and (2) the portion of that payment that the provider remits to a publisher for placing the ads on its website.  In a competitive market, advertisers would have paid less to have their ads placed, and publishers would have received more for placing the ads on their websites.

140.    With Google stifling competition and extracting monopoly rents as the dominant intermediary, both advertisers and publishers lost money.  The antitrust economist Fiona Scott Morton noted that,

> [i]f advertisers had more choices in the but-for world about where and through whom to place their ads, they would not continue to give their business to Google in the face of an overcharge. Google would have to choose between losing advertisers' business to rivals whose auctions were fair, or adopting an auction design that generated competitive (lower) prices for advertisers.

141.    In sum, the marked decrease in competition that has resulted from Google's conduct has caused economic injury to Plaintiff and class members because advertisers have paid more than they otherwise would have paid, and publishers have been paid less than they otherwise would have been paid.

## VIII.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.    The Statutes of Limitations Did Not Begin to Run Because Plaintiff Did Not and Could Not Discover Its Claims

142.    Plaintiff and class members had no knowledge of Google's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the class period and continuing thereafter.

143.    As described herein, Plaintiff and class members suffered economic loss as a result of Google's wrongful exercise of monopoly power in the relevant market.  Other than

dealing directly with Google when using its digital advertising services, Plaintiff had no direct contact or interaction with Google and had no means from which it could have discovered Google's wrongful conduct.

144.    Throughout the class period, and continuing thereafter, there was no information in the public domain sufficient to put Plaintiff and class members on notice that Google had wrongfully acquired a display advertising monopoly or was using its monopoly power to charge advertisers supra-competitive prices for display advertising and to pay sub-competitive prices to publishers of such advertising.

145.    It was reasonable for Plaintiff and class members not to suspect that Google was engaging in any unlawful anticompetitive behavior.

146.    Plaintiff alleges a continuing course of unlawful conduct by Google, including conduct within the applicable limitations periods.  That conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

147.    For these reasons, the statutes of limitations applicable to Plaintiff's and class members' claims have been tolled with respect to the claims asserted herein.

**B.    Google's Fraudulent Concealment Tolled the Statute of Limitations**

148.    Additionally or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiff's claims.  Plaintiff and class members had no knowledge of Google's wrongful acquisition and maintenance of monopoly power in the relevant market, or of facts sufficient to place them on inquiry notice of their claims, during the class period and continuing thereafter.  No information in the public domain or otherwise available to Plaintiff and class members during the class period suggested that Google had wrongfully acquired a digital advertising monopoly or was using its monopoly power charge advertisers supra-competitive prices for display advertising and to pay sub-competitive prices to

publishers of such advertising.

149.    Google concealed its illicit conduct, both by failing to disclose its wrongful acquisition and maintenance of a digital advertising monopoly through exclusionary acts in the relevant market, and by affirmatively denying that it was engaged in such conduct.  Google has (repeatedly) publicly denied allegations by American and foreign regulators that it has abused its power in digital advertising markets.  When the French Competition Authority fined Google $166 million in late 2019, Google publicly defended its policies as purportedly needed to "protect[ people] from exploitative and abusive ads."  Similarly, in response to news reports in early 2020 of impending actions against it by federal and state officials for monopolization, Google stated publicly that "[c]ompetition is flourishing, and publishers and marketers have enormous choice" when that was incorrect.

150.    Google's anticompetitive monopoly conduct also was inherently self-concealing because, as Google knew, its disclosure likely would have led to governmental enforcement activity or civil liability.  Digital advertising is subject to antitrust regulation, so it was reasonable for Plaintiff and class members to presume that digital advertising was sold in a competitive market.  A reasonable person under the circumstances would not have had occasion to suspect digital advertising was being sold and brokered at supra-competitive prices (for advertisers) and sub-competitive prices (for publishers) at any time during the class period.

151.    Because Google's antitrust violations were self-concealing and affirmatively concealed by Google, Plaintiff and class members had no knowledge of Google's antitrust violations or of any facts or information that would have caused a reasonably diligent person to suspect Google of having wrongfully acquired and maintained monopoly power during the class period.

152.    Therefore, by operation of Google's fraudulent concealment, the statutes of

limitations applicable to Plaintiff's and class members' claims were tolled throughout the class

period.

## IX.    CLASS ACTION ALLEGATIONS

153.    Plaintiff brings this action on behalf of itself and, under Rule 23 of the Federal

Rules of Civil Procedure, as representatives of the following class:

> All persons and entities in the United States that, from January 1,
> 2016 to the present, used Google's display advertising services to
> (1) place an ad on a website operated by another entity (advertisers)
> or (2) place an ad from a third party on their own website
> (publishers).

Excluded from the proposed class are: Defendants, their employees, co-conspirators, officers,

directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or

affiliated companies; class counsel and their employees; and the judicial officers and their

immediate family members and court staff assigned to this case.

154.    The proposed class meets the requirements of Federal Rules of Civil Procedure

23(a), (b)(1), (b)(2), and/or (b)(3).

155.    The members of the class are so numerous that joinder is impracticable.  The class

includes at least hundreds of thousands of members that are widely dispersed throughout the

country.

156.    Plaintiff's claims are typical of the claims of all class members.  Plaintiff's claims

arise out of a common course of conduct that gives rise to the claims of all other class members.

Plaintiff and all class members were and will continue to be damaged in the same manner by the

same wrongful conduct, namely Google's unfair business practices and monopolization of the

market for display advertising services.

157.     Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiff's interests are coincident with, and not antagonistic to, those of the class.

158.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with antitrust litigation.

159.     Numerous questions of law or fact common to the entire class—including, but not limited to, those identified below—arise from Google's anticompetitive and unlawful conduct:

   a.     Whether Google holds monopoly power in display advertising services markets;

   b.     Whether Google unlawfully acquired and maintained monopoly power in display advertising services markets;

   c.     Whether Google engaged in unfair business practices that reduced competition in display advertising services markets;

   d.     The form and content of injunctive relief to restore competition;

   e.     The amount of damages owed the class as a result of Google's illegal activity.

160.     Questions of law and fact common to members of the class will predominate over any questions that may affect only individual class members because Google acted on grounds generally applicable to the class as a whole.  For the same reason, class certification for purposes of adjudicating Plaintiff's claims for injunctive and declaratory relief is appropriate.

161.     This class action is superior to other alternatives for the fair and efficient adjudication of this controversy.  Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.

162.     The prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Google.

163.     Plaintiff reserves the right to seek class certification with respect to common issues, including issues related to Google's duties or conduct.

## X.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT
### 15 U.S.C. § 2

164.     Plaintiff incorporates the allegations set forth above as if fully set forth herein.

165.     Display advertising services in the United States is a relevant antitrust market and Google has monopoly power in that market.

166.     Google wrongfully acquired and unlawfully maintained monopoly power in the relevant market through the conduct alleged herein, including by leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage.

167.     Google's exclusionary conduct has foreclosed a substantial share of the online display advertising services market.

168.     As a direct and proximate cause of Google's conduct, Plaintiff and members of the class have suffered antitrust injury in the form of economic losses.  But for Google's unlawful conduct, competition would have prevailed in the relevant market and Plaintiff and the

class members would not have sustained these losses.  Google's conduct also deprived Plaintiff and class members of improved quality and innovation in the relevant market.

169.    Plaintiff and members of the class are entitled to equitable relief as appropriate to halt Google's monopoly conduct and restore competition in the relevant market.  Members of the class are regular users of display advertising services and will continue to purchase such services and suffer further injury if Google's monopoly is not ended.  The primary purpose of such injunctive relief will be to benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Google's monopoly.

170.    Plaintiff and members of the class are entitled to damages, including treble damages, sustained as a result of Google's monopolistic acts and practices.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the class defined herein, respectfully request that this Court:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action be given to the class, appoint Plaintiff as named representatives of the class, and appoint the undersigned Plaintiff's counsel as class counsel;

B.    Enter judgment against Google and in favor of Plaintiff and the class;

C.    Enter injunctive relief to restore competition in the relevant market and its constituent submarkets;

D.    Award damages, including treble damages, and/or restitution to the class in an amount to be determined at trial, plus interest in accordance with law;

E.      Award Plaintiff and the class their costs of suit, including reasonable

attorneys' fees, as provided by law; and

F.      Award such further and additional relief as is necessary to redress the

harm caused by Google's unlawful conduct and as the Court may deem just and proper under the

circumstances.

## XII.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all

matters so triable.


Dated: November 13, 2020                    Respectfully submitted,


By: *Richard E. Schimel*

Richard E. Schimel (D.C. Bar # 273193)
**LAW OFFICES OF RICHARD E SCHIMEL, LLC**
7315 Wisconsin Avenue
Suite 800 West
Bethesda, Maryland 20814-3244
(240) 395-4400
rschimel@lawofficesres.com

John Radice (*pro hac vice* forthcoming)
April Lambert (*pro hac vice* forthcoming)
Eva Kane (*pro hac vice* forthcoming)
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, New Jersey 08542
Tel: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
alambert@radicelawfirm.com
ekane@radicelaw.com


*Attorneys for Plaintiff*